IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**BRADLEY COTTRELL, on behalf of the
ESTATE OF BERNARD DALE
COTTRELL,**

   **Plaintiff,**

**v.**                                              **Civil Action No. 2:18-cv-01281
                                              Honorable Thomas E. Johnston**

**NATHAN SCOTT STEPP, Individually as
a member of the West Virginia State
Police; ZACH W. HARTLEY, Individually
as a member of the West Virginia State
Police; OKEY S. STARSICK, Individually
as a member of the West Virginia State
Police; ROBERT B. HICKMAN,
Individually as a member of the Roane
County Sheriff's Department; ROANE
COUNTY SHERIFF'S DEPARTMENT;
and WEST VIRGINIA STATE POLICE,**

   **Defendants**

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
### DEPUTY HICKMAN'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, Deputy Hickman, by his counsel, the law firm of Bailey & Wyant, PLLC,

Charles R. Bailey, and John P. Fuller, and in support of its Motion for Summary Judgment filed

contemporaneously herewith, shows this Court the following:

**I.     Factual History**

   **A.     Monday, September 5, 2016**

On Monday, September 5, 2016, Amanda Cottrell called Roane County 911, reporting a

"domestic disturbance" at the home of Virginia and Bernard Cottrell and requesting that a Law

Enforcement Officer be dispatched to aid Bradly Cottrell and Deborah Huffman in removing

Virginia Cottrell from the home.  *See 911 recording attached hereto as* **Exhibit A**.  Similarly,

Orland "Buddy" Huffman called 911 and requested aid from a Law Enforcement Officer in removing

his mother-in-law, Virginia Cottrell, from the Cottrell home.  *See 911 recording attached hereto as*

**Exhibit B**.  In his call, Mr. Huffman reported that Virginia Cottrell lived in a domestic violence

situation "pretty much all of her life." *Id.*

   Ultimately, Deputy Hickman and Trp. Harley were dispatched to the Cottrell family home.

*See Deposition of Deputy Hickman, pages 12-13, lines 17-24, 1-8, attached hereto as* **Exhibit C**.

Based upon the design of the home, Deputy Hickman and Trp. Hartley could not approach the front

door of the home and, instead, approached the rear door of the home. *Id. at page 17, lines 5-11*.

Deputy Hickman attempted to make contact with the occupants of the home.  Ultimately, Mr.

Cottrell answered the door and appeared agitated and informed Deputy Hickman that the voices did

not want him speaking to Deputy Hickman. *Id. at pages 17-18, lines 20-24, 1-5*.  Thereafter, a

vehicle entered the driveway and Deputy Hickman left the door and went to Trp. Hartley. *Id. at*

*pages 19-21, lines 20-24, 1-12*.  Upon speaking with the occupants of the vehicle that had pulled into

the driveway, Deputy Hickman learned that Virginia Cottrell was in the vehicle with her son, Bradley

Cottrell, and it was agreed that all would travel to a nearby grocery store to speak. *Id. at pages 21,*

*lines 1-15*.

   Upon arrival at the grocery store Deputy Hickman and Trp. Hartley spoke with Virginia

Cottrell, her son, Bradley Cottrell, her daughter, Deborah Huffman, and her son-in-law, Orland

"Buddy" Cottrell. *Id. at pages 21-23, lines 10-24, 1-24, 1-13*.  Deputy Hickman gave the family

information on how to apply for a Domestic Violence Petition or Mental Hygiene Petition. *Id*.  After

leaving the grocery store, Deputy Hickman had no further contact with Bernard Cottrell or his family

on Monday, September 5, 2016.

### B.     Tuesday, September 6, 2016

On Tuesday, September 6, 2016, Deputy Hickman and Trp. Hartley were traveling in Deputy Hickman's patrol vehicle, on a call in the area of Roane County near Clendenin,[1] WV and I-79.  *Id at page 32, lines 9-16*.  While on this call, Deborah Huffman called Deputy Hickman's mobile phone[2] and reported that her father, Bernard Cottrell, had called her and threatened suicide.  *Id. at pages 29-30, lines 15-24, 1-22*.  Upon receiving this call and believing that Deborah Huffman would be obtaining a Mental Hygiene Petition against Bernard Cottrell, Deputy Hickman and Trp. Hartley began traveling back towards Spencer, the county seat of Roane County, West Virginia[3.] *Id. at pages 31-32, lines 11-24, 1-24*.

Upon returning to Spencer, WV, Deputy Hickman and Trp. Hartley went to the Roane County Sheriff's Department Office.  *Id. at page 32, lines 21-24*.  While at the Roane County Sheriff's Department Office, Deputy Hickman received a second call from Deborah Huffman on his mobile phone.  *Id. at pages 33-34, lines 4-24, 1-21*.  In this second call, Deborah Huffman ultimately reported to Deputy Hickman that Bernard Cottrell had traveled to Bradley Cottrell's home in Mineral Wells, Wood County, West Virginia and fired a weapon into the home.  *Id.*  Deputy Hickman provided this information to Roane County 911, with the intention of Roane County 911 providing this information to Wood County 911 and dispatching an Officer to Brandley Cottrell's home.  *Id.*  Additionally, with this information, Deputy Hickman and Trp. Hartley returned to Deputy Hickman's patrol vehicle and began traveling towards Bernard Cottrell's home, with the intent of

---

1 Clendenin, WV lies in Kanawha County, WV.  The reference to I-79 and Clendenin is made to illustrate the portion of Roane County, WV where Deputy Hickman and Trp. Hartley were at the time Debera Huffman called Deputy Hickman.
2 Deputy Hickman does not know how Debera Huffman obtained his mobile phone number but believes she obtained it through the Roane County Board of Education as Deputy Hickman was assigned duties as the School Resource Officer and Debera Huffman and her husband, Orland "Buddy" Huffman, are both employed by the Roane County Board of Education.  Deputy Hickman does not believe he ever provided his mobile phone number directly to Debera Huffman.
3 From Exit 19 of I-79 it is approximately 26 miles to Spencer, WV via US 119.

performing a wellness check. *Id. at pages 34-35, lines 22-24, 1-6.*  In addition to the information received from Deborah Huffman in her second call to Deputy Hickman's mobile phone, Julie Triplett from Westbrook Health Services called Roane County 911 and stated that Deborah Huffman was in the process of filing a Mental Hygiene Petition against Bernard Cottrell but was fearful that he would harm himself before the Petition was completed and requested a welfare check by a Law Enforcement Officer.  *See 911 call by Julie Triplett attached hereto as* **Exhibit D**.

Deputy Hickman and Trp. Hartley left Spencer and began traveling North on State Route 14, a path that would take them towards Bernard Cottrell's home and the Wirt County/Roane County line.[4]  *See Deposition of Deputy Hickman at pages 34-35, lines 22-24, 1-6.*  After driving by Mr. Cottrell's home and not seeing his vehicle parked on the property, Deputy Hickman and Trp. Hartley returned to State Route 14, parking in a church parking lot in close proximity to the Wirt County/Roane County line, with the intent to initiate a traffic stop as Bernard Cottrell traveled south on State Route 14 from Wood County, WV. *Id. pages 35-37, lines 18-24, 1-24, 1-1-5.*

Ultimately, Bernard Cottrell did pass the church parking lot on State Route 14, acknowledging that he saw Deputy Hickman and Trp. Hartley proceeded south. *Id. at page 41, lines 4-21.*  Deputy Hickman pulled onto State Route 14 and attempted to initiate a traffic stop of Bernard Cottrell by activating his blue lights. *Id. at page 44, 2-5.*  At that point, Bernard Cottrell accelerated, made an illegal pass and caused a pursuit to begin. *Id. at page44, lines 6-20.*

Prior to Deputy Hickman attempting to initiate a traffic stop and Bernard Cottrell fleeing, Deputy Hickman and/or Trp. Hartley had made contact with Trp. Stepp and he was traveling north on State Route 16 to aid Deputy Hickman and Trp. Hartley. *Id. at page 38-39, lines 6-24, lines 1-5.*

---

4 If Bernard Cottrell had in fact been to Mineral Wells, Wood County, WV, where his son Bradley Cottrell lived, it is a reasonable assumption that he would travel south on State Route 14, traveling from Wood County to Wirt County, and ultimately to Roane County, to return home.

Ultimately, the chase headed south on State Route 14 passed Trp. Stepp as he headed north on State

Route 14.  *See video from Trp. Stepp's Cruiser attached hereto at* **Exhibit E**.  Once passed, Trp.

Stepp turned his vehicle south and joined the pursuit of Bernard Cottrell. *Id.*

Ultimately, after passing the intersection of State Route 14 and Randolph Road, south of the

intersection, Bernard Cottrell attempted to make a three-point turn. *Id. at pages 46-48, lines 12-24,*

*1-24, 1-2.*  Deputy Hickman stopped his vehicle just north of the Cottrell vehicle, in the south bound

lane. *Id. at page 48-49, lines 22-24, 1-4.*  Upon approaching the Cottrell vehicle and Deputy

Hickman's vehicle, observing Bernard Cottrell attempt to pull forward, and presumable travel north

on State Route 14, Trp. Stepp made the decision to block the Cottrell vehicle.

However, Trp. Stepp ultimately dismissed the plan to block the Cottrell vehicle and decided

to ram the Cottrell vehicle:

> Q.   You said he wasn't able to complete that three-point turn. How does his
> vehicle eventually come to a stop?
>
> A.   I crash into it.
>
> Q.   At what point of this three-point turn do you crash into him?
>
> A.   It was - - I guess it would be when he was perpendicular to the road. Crash
> may be the wrong word. It was more like a ram. It was an intentional crash.
>
> Q.   Did you communicate your intent with Deputy Hickman and Trooper Hartley
> to ram your vehicle into Mr. Cottrell's vehicle?
>
> A.   Yes.
>
> Q.   What did you tell them about that?
>
> A.   When he was doing the three-point turn, the initial plan was I was going to
> block the road and block him in there so he couldn't go any further, but then
> other things happened.
>
> Q.   Was it your intent to actually make contact with his vehicle?

A.      No. The initial plan was to block his vehicle in.

Q.      And did you discuss what Deputy Hickman and Trooper Hartley were going to do at the point that you blocked Mr. Cottrell's vehicle in?

A.      There wasn't enough time.

Q.      So what's the reason you ultimately run into Mr. Cottrell's vehicle?

A.      He started brandishing a shotgun.

Q.      And so I understand the timing of this, Mr. Cottrell starts brandishing the shotgun at the point that you're moving in the direction of his vehicle to block him in? Is that correct?

A.      Yes.

Q.      And how is Mr. Cottrell's vehicle situated relative to yours at the time that you first see Mr. Cottrell brandishing a shotgun?

A.      He was - - he kind of swoops into - - he was heading south, and he kind of goes in the other lane and goes like this, curves back into his lane, and he goes up. It's perpendicular. Then he backs up. That's when I see it.

Q.      All right. So it's at the time that Mr. Cottrell is perpendicular with Route 14?

A.      Yes. If not a hundred percent perpendicular, it was in the perpendicular direction.

Q.      From the way that you're looking at him, what window or windows are you able to see him through?

A.      The front passenger and the windshield. The front driver's side, I should say, and then the windshield.

Q.      Okay. When you're using the term "brandishing" to describe what you saw at that point, can you tell me what specifically you mean by that?

A.      He had a shotgun-like object. We're assuming it was a shotgun based off information we were given prior to all this. That he was holding it, picking it up with his right hand, trying to pick it up. When I say "pick it up," he was trying to get it aimed in the vehicle. *See Deposition of Trooper Stepp, pages 45-47, lines 15-24,1-24, 1-21, attached hereto as* **Exhibit F**.

Q.      At what point does your plan to block off Mr. Cottrell's vehicle become an

intent to actually make contact with his vehicle?

A.      Once I noticed that shotgun.

Q.      What was your intent with ramming Mr. Cottrell's vehicle?

A.      Basically just to stop him at that point in time. At that point he would lose
        focus, and that would be it.

Q.      Approximately how fast was your vehicle traveling when you struck Mr.
        Cottrell's vehicle?

A.      I don't know.

Q.      Once you saw this object, did you accelerate at all, or did you maintain speed?

A.      I accelerated.  *Id. at page 5-18.*

Immediately after the collision, Trp. Stepp was still able to observe Bernard Cottrell in his

vehicle attempting to point the shotgun at him:

Q.      Can you still see Mr. Cottrell at this point?

A.      Yes, ma'am.

Q.      And again, through what windows of the vehicle are you able to see him
        through at this point?

A.      At this point in time it's only the windshield.

Q.      Do you see him do anything at this point?

A.      He's trying to raise that - - or lower that weapon down towards me.  *Id. at
        page 52, lines 1-17.*

Following the collision, Trp. Stepp exited his vehicle.  Upon exiting his vehicle, Trp. Stepp

announced to the other officers that a weapon was present.  Specifically, Trp. Hartley offered the

following:

Q.      Tell me what happened next once you got out of your vehicle?

A.      So once I exited Deputy Hickman's passenger side door, as I was exiting, I

7

heard Trooper Stepp yell, "Gun, gun, gun." He began to fire. That's when I locked my attention on Mr. Cottrell. I could see the camouflage stock. At that point in time, we didn't know if it was a rifle or a shotgun, but it appeared to be laying on the driver dash - - or excuse me - - the dashboard. His right hand was on the stock of the firearm. I can't say that it was grasping the trigger, but it was in that area. That's when I engaged. *See Deposition of Trp. Hartley, page 37, lines 6-17, attached hereto as* **Exhibit G**.

Similarly, upon exiting his vehicle, Deputy Hickman also heard Trp. Stepp announce the presence of a firearm in the Cottrell vehicle:

Q.    After you see Trooper Stepp's vehicle make contact with Mr. Cottrell's vehicle, what do you do next?

A.    At that point in time, I know that Trooper Stepp got out of his car, and I'm trying to get out of my car, and I get tangled up – where I had my seatbelt on during the pursuit, and I got tangled up and missed just a hair, but as I was coming out of my car, of course, headed towards Mr. Cottrell's car, at that point in time I believe I hear the words "Gun," and then Trooper Stepp begins firing - - begins to fire, I should say. *See Deposition of Deputy Hickman, pages 51-52, lines 18-24, 1-3.*

As Trp. Stepp fired his weapon at Bernard Cottrell, Mr. Cottrell continued to track Trp. Stepp with the barrel of the shotgun.  With regard to this issue, Trp. Stepp offered the following:

Q.    What movements did you see Mr. Cottrell make following your reloading?

A.    It was like he was tracking me with that gun, so aiming at me as I moved. He was still aiming that gun. *See Deposition of Trp. Stepp, page 58, lines 11-14, attached hereto as* **Exhibit F**.

Trp. Hartley, offered testimony with regarding the danger posed to anyone in front of the shotgun barrel:

Q.    Would I be accurate in saying you aim a pistol or rifle, but you point a shotgun?

A.    Yes, sir.

Q.    And is that because with a shotgun, you do not have to be as accurate?

A.    It's an area weapon, yes, sir.

8

Q.      Tell me what you mean by an "area weapon."

A.      An area weapon covers more mass on a surface versus a rifle or pistol that covers less surface distance and is more precise on a location shot.

Q.      Am I generally correct that a pistol or rifle fires a single projectile per round?

A.      Yes, sir.

Q.      And that a shotgun fires a mass of BBs?

A.      Yes, sir.

Q.      Have you ever been shot with a shotgun?

A.      Yes, sir.

Q.      And was it your experience that it didn't have to be aimed, it just had to be pointed?

A.      Yes, sir.

Q.      Did you believe that Trooper Stepp was in danger of being hit with a blast from that shotgun?

A.      Yes, sir. *See Deposition of Trp. Hartley, pages 57-58, lines 13-24, 1-11, attached hereto as* **Exhibit G**.

There is no dispute that once the firing concluded, Deputy Hickman moved to the passenger's side of the Cottrell vehicle to provide cover for Trp. Stepp while Trp. Harley provided cover from the driver's side of the Cottrell vehicle, as Trp. Stepp broke the passenger's side window to retrieve Mr. Cottrell's weapon.  At that time each observed that Mr. Cottrell continued to hold a pump-action shotgun with a camouflage stock in his right hand.  *See Deposition of Deputy Hickman, pages 60-61, lines 13-34, 1-5. Deposition of Trp. Stepp, page 64, lines 6-23. Deposition of Trp. Hartley, pages 46-47, lines 20-24, 1-2.*

Based upon the foregoing, it is without question that Bernard Cottrell was known to be armed

to Deputy Hickman, Trp. Hartley and Trp. Stepp prior to the pursuit that ended in the death of Bernard Cottrell on September 6, 2016.  Additionally, it is without question that Trp. Stepp observed Bernard Cottrell attempting to level the shotgun at Trp. Stepp as Trp. Stepp maneuvered his cruiser, initially to block the Cottrell vehicle and ultimately ramming the Cottrell vehicle.  It is without question that Bernard Cottrell tracked Trp. Stepp with the barrel of the shotgun as Trp. Stepp, Trp. Hartley and Deputy Hickman fired into the Cottrell vehicle.  It is also without question that once the firing stopped, both Troopers and Deputy Hickman observed Bernard Cottrell continuing to grip the shotgun as Trp. Stepp removed it from the vehicle.

## II.     Standard of Law

"Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kitchen v. Summers Continuous Care Center, LLC*, 552 F.Supp.2d 589, 592 (S.D.W.Va. 2008) (Quoting *Fed.R.Civ.P.* 56(c)).  "The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 322-323 (1986).  "When determining whether there is an issue for trial, the Court must view all evidence in the light most favorable to the non-moving party." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123 (4th Cir.1990). "The nonmoving party nonetheless must offer some 'concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]'" *Piedmont Behavioral Health Ctr., LLC v. Stewart*, 413 F.Supp.2d 746, 751 (S.D.W.Va. 2006) (Goodwin, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the non-moving party's] case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

III.     Argument

A.     **The force utilized by Deputy Hickman was objectively reasonable.**

Deputy Hickman did not use an unreasonable amount of force in attempting to detain Bernard Cottrell.

Excessive force claims are reviewed under the Fourth Amendment's objectively reasonable standard.  _Anderson v. Russell_, 247 F.3d 125, 129 (4th Cir. 2001) (citing _Graham_, 490 U.S. at 397, 109 S.Ct. 1865). Under this standard, "[t]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." _Id._ The reasonableness of a particular use of force is analyzed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." _Graham_, 490 U.S. at 396, 109 S.Ct. 1865.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." _Id._ at 396–97, 109 S.Ct. 1865.  When analyzing an excessive force claim, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." _Id._ at 396, 109 S.Ct. 1865.

Federal courts "weigh the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." _Jones v. Buchanan_, 325 F.3d 520, 527 (4th Cir.2003) (citation omitted).  The test requires the Court to consider the specific facts and circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." _Id_. (quoting _Graham_, 490 U.S. at

11

396, 109 S.Ct. 1865).  Thus, the totality of the circumstances must demonstrate that the amount of force applied was objectively reasonable.  *Id.*  Hence, the question is not whether Deputy Hickman was justified in using any force against Bernard Cottrell, but rather whether the amount of force he used was objectively reasonable.

Turning to each of the *Graham* factors, it is clear that the force utilized by Deputy Hickman was objectively reasonable.  With regard to the first factor, while Bernard Cottrell had committed a long list of crimes prior to the stop, including brandishing a weapon at the home of his Son, daughter-in-law and grandchildren in Wood County, West Virginia, at the time of the stop Bernard Cottrell was brandishing a pump-action shotgun at Trp. Stepp.  Clearly, one cannot discount the seriousness of pointing a pump-action shotgun at a law enforcement officer.

When turning to the second factor, Bernard Cottrell posed a deadly threat to each of the law enforcement officers on scene and particularly to Trp. Stepp as the pump-action shotgun was pointed out the front of the Cottrell vehicle and, therefore, placed Trp. Stepp in the zone of danger of a shotgun blast.  Similarly, Trp. Stepp's testimony is crystal clear; as he moved away from the front of the Cottrell vehicle and toward the passenger side of the Cottrell vehicle, Bernard Cottrell continued to track Trp. Stepp with the barrel of the pump-action shotgun.

Finally, when turning to the third factor, Bernard Cottrell's vehicle had just been rammed, in an attempt to end a high-speed pursuit.  However, Bernard Cottrell's vehicle remained in gear and was pushing against Trp. Stepp's cruiser.  Bernard Cottrell had been fleeing law enforcement since crossing the Wirt/Roane County line and was attempting to make a three-point turn when Trp. Stepp observed the shotgun, abandon his plan to block the Cottrell vehicle and elected to ram the Cottrell vehicle.  It could be nothing more than speculation to say that Bernard Cottrell had abandon his intent to continue to actively flee law enforcement when his vehicle was rammed by Trp. Step.

12

Based upon the foregoing, it is clear that the force utilized by Deputy Hickman, as well as Trps. Stepp and Hartley was reasonable given the threat posed by Bernard Cottrell. Specifically, the threat posed to Trp. Stepp who was being tracked with a deadly weapon.

**B.    Defendant Hickman is entitled to qualified immunity.**

Even assuming a Fourth Amendment violation occurred, which Deputy Hickman does not concede, Deputy Hickman is entitled to qualified immunity because no competent officer would have known that shooting Bernard Cottrell to protect himself, Trp. Hartley and/or Trp. Stepp would have violated the Fourth Amendment because the Bernard Cottrell was armed with a pump-action shotgun, had pointed the shotgun at Trp. Stepp, was tracking Trp. Stepp with the shotgun, and the situation unfolded in less than a minute.

Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *White v. Pauly*, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017). Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. 548, 196 L. Ed. 2d 463, at 468) (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Ibid. (internal quotation marks omitted). This Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015)) (quoting *Ashcroft v. al-Kidd*, 563 U. S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)); see also *Brosseau, supra*, at 198-199, 125 S. Ct. 596, 160 L. Ed. 2d 583.

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has

13

recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015).  Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Id*., 136 S. Ct. 305, 193 L. Ed. 2d 255, at 260.  Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful. *Id*., 136 S. Ct. 305, 193 L. Ed. 2d 255, at 263.

"Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *White*, 137 S. Ct. 548, 196 L. Ed. 2d 463, at 468). But the general rules set forth in "Garner and Graham do not by themselves create clearly established law outside an 'obvious case.'" Ibid.  Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.  An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014).

The facts of the instant case are remarkably similar to the facts of *Kisela v. Hughes, 138 S.Ct. 1148, 200 L. Ed. 2d 449 (2018)*. In *Kisela*, police officers in Tucson, Arizona responded to a radio call that a woman was engaging in erratic behavior with a knife.  The officers had been on scene briefly, perhaps just a minute.  When Officer Kisela fired, Hughes was holding a large kitchen knife, had taken steps toward another woman standing nearby and had refused to drop the knife. *Id. at 1150.*  Following the shooting, all three officers on scene said that the subjectively believed that

14

Hughes posed a threat to the woman standing nearby. *Id.*  In reaching its decision, the *Kisela* Court noted that it "…need not, and does not, decide whether Kisela violated the Fourth Amendment when he used deadly force against Hughes.  For even assuming a Fourth Amendment violation occurred – a proposition that is not at all evident – on these facts Officer Kisela was at least entitled to qualified immunity. *Id. at 1152*. In finding qualified immunity, the *Kisela* Court held that "[T]his is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment." *Id. at 1153.*

Just as in *Kisela*, the situation unfolded and ended within seconds, likely less than a minute. Deputy Hickman's testimony is clear; as soon as he exited his vehicle Trp. Stepp announced "Gun" and began firing his weapon at Bernard Cottrell.  Likewise, both Trp. Hartley and Deputy Hickman began firing to eliminate the threat to Trp. Stepp.  While this case is factually very similar to *Kisela*, it does have one significant difference. In *Kisela*, the Plaintiff held a knife which is typically a "contact weapon," however; in the instant case, Bernard Cottrell was wielding a pump-action shotgun (an area weapon) that could produce deadly results even haphazardly aimed from inside the Cottrell vehicle.  Clearly, no competent officer would have known that shooting Bernard Cottrell to protect Trp. Stepp would violate the Fourth Amendment.  Therefore, Deputy Hickman is entitled to qualified immunity from all claims asserted in the above-captioned matter.

### C.    It is proper for the Court to Grant Summary Judgment with regard to all claims asserted under Article III, Section 10 of the West Virginia Constitution.

In Count IV of the Complaint, Plaintiff alleges that Deputy Hickman used "excessive and deadly force…during the shooting of Mr. Cottrell on September 6, 2016, resulting in his death." *See ECF Document No. 1 at page 12*.  Claims based on Article III, Section 10 of the West Virginia Constitution, which corresponds with the Federal Constitution's due process clause, in Article III,

15

Section 6 of the West Virginia Constitution, which corresponds with the Federal Constitution's Fourth Amended Protections and said reasonable search and seizures. The Unites State Supreme Court has held that "all claims that law enforcement officers have used excessive-deadly or not-in the course of an arrest, investigatory stop, or other internal "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substitutive due process" approach." *Graham v. Conner*, 490 U.S. 386, 395 (1989); *United States v. Lanier*, 520 U.S. 259, 272n. 7 (1997).

Although the West Virginia Constitution may in some circumstances provide additional protections beyond those provided by the United States Constitution. *State v. Osakalumi*, 461 S.E.2d 504, 512 (W.Va. 1995), "the protections afforded West Virginia Citizens under [Article III, Section 6 of the state constitution] are coextensive with those provided in the Fourth and Fourteenth Amendments to the United States Constitution." *State v. Clark*, 752 S.E.2d 907, 920, 921 (W.Va. 213).

Therefore, as the protections afforded by substitutive due process are at best redundant of those afforded by the more specific provisions of Article III, Section 6 it is proper for this Court to grant summary judgment with regard to all claims asserted under Article III, Section 10 of the West Virginia Constitution.

**IV.     Conclusion**

Based upon the foregoing, Deputy Hickman did not violate the Fourth Amendment of the United States Constitution by using deadly force against Bernard Cottrell when Bernard Cottrell was brandishing a pump-action shotgun at Trp. Stepp. Even if this Court were to find a Fourth Amendment violation, which Deputy Hickman denies, all claims asserted by the Plaintiff are barred by qualified immunity afforded to Deputy Hickman. Therefore, it is proper for this Court to enter an

Order granting summary judgment in favor of Deputy Hickman with regard to all claims asserted by the Plaintiff.

**DEPUTY ROBERT B. HICKMAN,**

**By Counsel,**

  /s/ John P. Fuller
**Charles R. Bailey (WV Bar #0202)**
**John P. Fuller (WV Bar #9116)**
**Jeffrey M. Carder (WV Bar #12725)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**cbailey@baileywyant.com**
**jfuller@baileywyant.com**
**jcarder@baileywyant.com**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BRADLEY COTTRELL, on behalf of the
ESTATE OF BERNARD DALE
COTTRELL,

    Plaintiff,

v.

                                                Civil Action No. 2:18-cv-01281
                                                Honorable Thomas E. Johnston

NATHAN SCOTT STEPP, Individually as
a member of the West Virginia State
Police; ZACH W. HARTLEY, Individually
as a member of the West Virginia State
Police; OKEY S. STARSICK, Individually
as a member of the West Virginia State
Police; ROBERT B. HICKMAN,
Individually as a member of the Roane
County Sheriff's Department; ROANE
COUNTY SHERIFF'S DEPARTMENT;
and WEST VIRGINIA STATE POLICE,

    Defendants

## <u>CERTIFICATE OF SERVICE</u>

    **I HEREBY CERTIFY** that a true and correct copy of foregoing "**Memorandum of Law in Support of Defendant Deputy Hickman's Motion for Summary Judgment**" was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, Monday, September 9, 2019:

Russell A. Williams
Katz, Kantor, Stonestreet & Buckner PLLC
112 Capitol Street, Suite 200
Charleston, WV 25301
*Counsel for Bradley Cottrell*

Vincent Arrigo
Nicolette A. Ward
Romanucci & Blandin, LLC
321 North Clark Street, Suite 900
Chicago, IL 60654
*Counsel for Bradley Cottrell*

Michael Mullins
Steptoe & Johnson PLLC
Chase Tower, 17th Floor
707 Virginia Street, East
PO Box 1588
Charleston, WV  25326-1588
*Counsel for Trooper Okey S. Starsick, Trooper Scott Stepp,*
*Trooper Zach W. Hartley and West Virginia State Police*


  **/s/ John P. Fuller**
**Charles R. Bailey (WV Bar #0202)**
**John P. Fuller (WV Bar #9116)**
**Jeffrey M. Carder (WV Bar #12725)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**cbailey@baileywyant.com**
**jfuller@baileywyant.com**
**jcarder@baileywyant.com**