## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

**BRADLEY COTTRELL,**
        *Plaintiff,*

*v.*

**No. 2:18-cv-01281**
**Hon. Thomas E. Johnston**

**NATHAN SCOTT STEPP,** *et al.,*
        *Defendants.*

### MEMORANDUM IN SUPPORT OF DEFENDANTS STEPP, HARTLEY, AND STARSICK'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

In September 2016, Bernard Cottrell lived with his wife, Virginia, in Reedy, Roane County, West Virginia.   Bernard and Virginia had two children: Bradley Cottrell (Plaintiff) (married to Amanda) and Deborah Huffman (married to Orland "Buddy").   Bernard had a lengthy history of schizophrenia.[1]   He also had a lengthy history of violence toward his wife,[2] his children, and even his grandchildren.[3]   Bradley described it as a "lifetime" history of abuse[4] that got "pretty bad at points."[5]   On September 5, 2016, Bernard again physically abused Virginia.[6]   He told her that Bradley should remove her from the house or he would hurt her.[7]   Virginia heeded his warning.[8]   Bradley was plainly concerned for their safety: before he confronted his father, he retrieved his .40 caliber handgun and took it with him.[9]

---

[1]        (Compl. ¶ 20;  B. Cottrell Dep. at 10–11, 21–22, 93 (attached as Ex. C);  A. Cottrell Dep. at 6 (attached as Ex. A);  D. Huffman Dep. at 13 (attached as Ex. E).)

[2]        (V. Cottrell Stmt. at 2 (attached as Ex. O).)

[3]        (O. Huffman Stmt. at 3 (attached as Ex. J).)

[4]        (B. Cottrell Stmt. at 6 (attached as Ex. D).)

[5]        (*Id.* at 22–23;  *see* A. Cottrell Stmt. at 5 (attached as Ex. B) (Bernard slapping or punching Virginia's face.)

[6]        (V. Cottrell Stmt. at 1 (Bernard struck his wife and "was abusive" to her);  D. Huffman Dep. at 24–25.)

[7]        (A. Cottrell Dep. at 42;  D. Huffman Stmt. at 1 (attached as Ex. F);  V. Cottrell Stmt. at 1;  O. Huffman Stmt. at 3;  B. Cottrell Stmt. at 2;  A. Cottrell Stmt. at 1–2.)

[8]        (B. Cottrell Dep. at 5 and 89.)

[9]        (*Id.* at 8.)

When Bradley arrived to get his mother, he could see that she did indeed already have bruises on her arms.[10]  His wife, Amanda, had called 911 to request assistance with the developing domestic situation at Bernard and Virginia's house "as a precautionary measure to make sure that [Bradley] was safe in that situation"[11] and to help her husband and mother-in-law "get out of there safely."[12]  Amanda also called her sister-in-law, Deborah, and apprised Deborah of the situation with Bernard.[13]  And Deborah's husband, Buddy, also called 911 to request police assistance.[14]  The Roane County 911 Telecommunications Center dispatched Roane County Sheriff's Deputy Robert B. Hickman ("Deputy Hickman") and West Virginia State Police Trooper Zach W. Hartley ("Trooper Hartley") (who were working together that day, the only officers working in the whole county[15]) to respond to the domestic disturbance.  The dispatcher told the officers that Bernard had been abusive to his wife for years and that she wanted to end their relationship.[16]  So Deputy Hickman and Trooper Hartley headed toward Bernard's residence to see if Virginia was in danger and to check on her well-being.[17]

Deborah and Buddy Huffman had also set out for Bernard and Virginia's house,[18] but by the time they got there, Bradley had already rescued his mother and left,[19] so the Huffmans turned around and headed back toward town.  As they headed out, they passed Deputy Hickman and Trooper Hartley, still headed toward Bernard and Virginia's.[20]  Deputy Hickman

---

[10]   (*Id.* at 24;  B. Cottrell Stmt. at 3;  N. Stepp Dep. at 28 (attached as Ex. I).)
[11]   (B. Cottrell Dep. at 6.)
[12]   (A. Cottrell Dep. at 9–10.)
[13]   (D. Huffman Dep. at 9;  O. Huffman Stmt. at 1.)
[14]   (D. Huffman Dep. at 10;  D. Huffman Stmt. at 1;  O. Huffman Stmt. at 1.)
[15]   (R. Hickman Dep. at 12–13 (attached as Ex. L);  N. Stepp Dep. at 30–31.)
[16]   (*See, e.g.*, R. Hickman Dep. at 12–13.)
[17]   (R. Hickman Dep. at 15;  Z. Hartley Dep. at 11 (attached as Ex. P).)
[18]   (O. Huffman Stmt. at 1.)
[19]   (*See, e.g.*, D. Huffman Dep. at 21–22.)
[20]   (R. Hickman Dep. at 14–16.)

and Trooper Hartley advised Deborah and Buddy to wait at the Reedy Grocery,[21] and the officers continued to the scene.[22]   When the officers arrived and Bernard finally agreed to speak with them, he was extremely agitated, stomping his feet, using profane language, and telling the officers that the voices inside his head did not want him to speak with them.[23]   And he slammed the door.[24]   Amanda eventually called Bradley and told him that she had called 911 and that the officers were in route to his parents' house to check on Virginia,[25] so Bradley returned to speak with the officers.[26]   Bradley told the officers that he had already rescued Virginia, so they advised him to meet them and the Huffmans at the Reedy Grocery store.[27]

The officers then left to meet with the family.[28]   There, they learned of Bernard's psychiatric disturbances[29] and that Bernard was "supposed to have had guns throughout the house or multiple firearms in the home."[30]   The officers[31] advised the family how to obtain a domestic violence petition against Bernard[32] or to have Bernard committed for a mental hygiene assessment.[33]   Virginia went with the Huffmans to their residence in Walton, Roane County,[34] and Bradley returned to his home in Mineral Wells, Wood County.[35]

---

[21]     (O. Huffman Stmt. at 1.)
[22]     (R. Hickman Dep. at 16–17.)
[23]     (*See, e.g.*, R. Hickman Dep. at 17–18;  Z. Hartley Dep. at 12–13;  D. Huffman Stmt. at 2.)
[24]     (R. Hickman Dep. at 19–20.)
[25]     (B. Cottrell Stmt. at 15–16.)
[26]     (R. Hickman Dep. at 19–20;  B. Cottrell Dep. at 6;  A. Cottrell Dep.. at 12–13;  B. Cottrell Stmt. at 2.)
[27]     (B. Cottrell Dep. at 5–6;  R. Hickman Dep. at 21;  Z. Hartley Dep. at 13, 16.)
[28]     (B. Cottrell Dep. at 6–7;  A. Cottrell Dep.. at 12;  Z. Hartley Dep. at 17.)
[29]     (B. Cottrell Dep. at 11;  D. Huffman Dep. at 26–27;  R. Hickman Dep. at 23–24.)
[30]     (R. Hickman Dep. at 77.)
[31]     (D. Huffman Stmt. at 2;  B. Cottrell Stmt. at 3–5;  Z. Hartley Dep. at 17–19.)
[32]     *See* W. VA. CODE § 48-27-101 to -1105.
[33]     *See* W. VA. CODE § 27-5-2.
[34]     (B. Cottrell Dep. at 11–12;  A. Cottrell Dep. at 14;  D. Huffman Stmt. at 2;  O. Huffman Stmt. at 1;  B. Cottrell Stmt. at 4.)
[35]     (B. Cottrell Dep. at 13.)

The following morning, Bernard called Deborah several times.[36]  In the first call, he demanded to know where Virginia was.[37]  Deborah testified that she told Bernard only "that Bradley came and got her," referring to previous day,[38] but Amanda believed that Bernard believed that Virginia was at Bradley's house on September 6.[39]  This was especially troubling to Amanda, because on previous occasions, Bernard had threatened that if Bradley ever took Virginia away from him, "he would come up to [Bradley's] house and blow holes in it."[40]

During a second call, Bernard announced that he was going to kill himself.[41]  He had previously made it clear that if he ever wanted to kill himself, he would force the police to do it for him—*i.e.*, that he would commit "suicide by cop"[42]—and this information was also relayed to the officers.[43]  So when Deborah told Bradley about Bernard's calls,[44] Bradley was justifiably concerned that his father might indeed show up at Bradley's house looking for Virginia.  He was so concerned that he told Amanda not to answer the phone or leave the house,[45] and he showed her where his gun was and how to use it "because [he] had some concern that if [his] dad showed up at the house that he [Bernard] might be violent and cause some problems . . . ."[46]  He then left work and returned home to defend his family from his father.[47]

---

[36]      (D. Huffman Stmt. at 3.)

[37]      (D. Huffman Dep. at 35–36;  *see also* B. Cottrell Dep. at 38;  A. Cottrell Dep. at 17–18;  D. Huffman Stmt. at 3.)

[38]      (D. Huffman Dep. at 37.)

[39]      (A. Cottrell Dep. at 17–18;  A. Cottrell Stmt. at 9.)

[40]      (A. Cottrell Dep. at 37–38;  B. Cottrell Dep. at 31;  K. Dye Dep. at 13 (attached as Ex. G);  V. Cottrell Stmt. at 2;  O. Huffman Stmt. at 1 (Bernard threatened to kill his children's families "fairly frequently").)

[41]      (D. Huffman Dep. at 36;  D. Huffman Stmt. at 3;  A. Cottrell Dep. at 19.)

[42]      (D. Huffman Dep. at 45–46;  V. Cottrell Stmt. at 2 ("numerous times");  O. Huffman Stmt. at 2 (Bernard threatened to use booby-traps to harm anyone who came to get him);  B. Cottrell Stmt. at 8–9.)

[43]      (N. Stepp Dep. at 48–49 (family told him when he first became involved about Bernard's plan to force the police to kill him).)

[44]      (D. Huffman Dep. at 39.)

[45]      (B. Cottrell Dep. at 58;  A. Cottrell Dep. at 15–16;  A. Cottrell Stmt. at 4–5.)

[46]      (B. Cottrell Dep. at 32;  A. Cottrell Dep. at 15–16.)

[47]      (B. Cottrell Dep. at 34 and 37;  *see also* A. Cottrell Dep. at 18–19;  B. Cottrell Stmt. at 9.)

Bradley's concerns about Bernard showing up to make good on his threat[48] were well-founded:  Bernard drove up Bradley's driveway toting a camouflaged shotgun.[49]  Predicting this likely event, Bradley had also warned Amanda to not get near the windows when Bernard showed up, so when she heard a "really long honk,"[50] she "peeked [her] head around the side of the [house's front picture window],"[51] at which point she saw that Bernard had stopped in front of the house with his car's passenger's side window down, leveled his shotgun at the house,[52] and was shouting "very, very loud[ly]"[53] that "he was going to kill you MFers."[54]

Amanda was understandably terrified, in tears, and hysterical.[55]  She "just turned around and . . . started screaming, [']Brad, oh, my God.  Your dad is here.  He's going to kill us. He's going to shoot us.  Your dad is outside with the gun.[']"[56]  Bradley's wife's sister, Katlyn Dye,[57] also there with her children,[58] was also afraid;[59]  the children were in tears.[60]  Amanda told the police that she "honestly to [G]od believe[d] he [Bernard] was gonna kill [her and her] children."[61]  Bradley "was in shock."[62]  He was naturally concerned about his family's safety given that his father had shown up at their house with a shotgun, so he directed Katlyn to shelter

---

[48]       (A. Cottrell Dep. at 38 and 48.)
[49]       (V. Cottrell Stmt. at 2.)
[50]       (A. Cottrell Dep. at 43;  *see also* A. Cottrell Stmt. at 5;  K. Dye Dep. at 5.)
[51]       (A. Cottrell Dep. at 22–23.)
[52]       (A. Cottrell Dep. at 19–20 ("Q: But he pointed a gun at the house, didn't he?  A: Yes.  Q: And you saw the gun?  A: Yes. . . .  Q: You were familiar with the gun?  A: Yes.  Q: You knew it was a real gun?  A: Yes.  Q: And as I understand it, it was a shotgun that was camouflaging—  A: Yes.").)
[53]       (A. Cottrell Dep. at 44.)
[54]       (B. Cottrell Dep. at 58;  *accord* A. Cottrell Dep. at 20–21;  B. Cottrell Stmt. at 11;  B. Cottrell Dep. at 47– 49 and 56–58;  A. Cottrell Stmt. at 7–8.)
[55]       (A. Cottrell Dep. at 21–22.)
[56]       (*Id.* at 21–22;  *see* K. Dye Dep. at 8;  B. Cottrell Stmt. at 9–11;  A. Cottrell Stmt. at 8–9.)
[57]       (K. Dye Dep. at 5;  A. Cottrell Dep. at 44.)
[58]       (A. Cottrell Stmt. at 6.)
[59]       (K. Dye Dep. at 10.)
[60]       (*Id.* at 10.)
[61]       (A. Cottrell Stmt. at 10.)
[62]       (B. Cottrell Dep. at 47–49.)

herself, her children. and the Cottrells' children in a back bedroom.[63]  He then told the others to get down so he could take up a defensive stance if Bernard advanced toward the house.[64]

Bradley then went to his bedroom and again retrieved his own gun[65] "in case [he] needed to protect [him]self[]"[66] from Bernard.  When he walked outside, pistol in hand,[67] to confront his father, he "knew beyond a shadow of a doubt" that in a shotgun-versus-pistol battle, the shotgun-toting Bernard "would win that fight" because a shotgun's ammunition covers a much wider spread than a handgun's bullet.[68]  Fortunately, Bernard, who was still talking to himself because of "the disease that he had,"[69] sped off[70]—toward the Huffmans' house, the family believed.[71]  As Bernard fled, Bradley yelled, "Stop you coward" and "I should kill you son of a bitch[; . . .] how could you do this to us[] you're nothing but a psycho asshole"[72] at his father.[73]  Bradley then went to check on his family members[74] and reminded them again not to leave the house until the family could obtain some kind of order against Bernard.[75]

Amanda contacted Deborah and told her, "Debbie, your dad just showed up with a gun to the house, and I think he's going to kill us or he's going to shoot us."[76]  Bradley's

---

[63]   (*Id.* at 47–49;  A. Cottrell Dep. at 24;  K. Dye Dep. at 8–9 and 39.)

[64]   (B. Cottrell Dep. at 63;  B. Cottrell Stmt. at 12.)

[65]   (B. Cottrell Dep. at 47–49;  B. Cottrell Stmt. at 9;  A. Cottrell Dep. at 24 ("And he went back and he got his gun and the next thing I know, he went out—he just ran out with his gun.  He ran out to the front of the house or, you know, out to the living room with it.");  *see also* A. Cottrell Dep. at 25–26 (testifying that the reason Plaintiff's gun was in the bedroom and not the safe, where it was normally kept, was because Plaintiff had gotten it out in preparation for a possible encounter with his father).)

[66]   (B. Cottrell Dep. at 107.)

[67]   (*Id.* at 50.)

[68]   (*Id.* at 62;  *see also id.* at 62–63 ("A: A 12-gauge against a handgun there is not—   Q: You don't stand much of a chance, right?  A: No, sir, you don't.");  *see also* A. Cottrell Stmt. at 9.)

[69]   (*Id.* at 55.)

[70]   (Compl. ¶ 21.)

[71]   (V. Cottrell Stmt. at 2 and 3;  O. Huffman Stmt. at 2.)

[72]   (K. Dye Stmt. at 10 (attached as Ex. H).)

[73]   (B. Cottrell Dep. at 47–49 and 55;  *accord* A. Cottrell Dep. at 30.)

[74]   (B. Cottrell Dep. at 57–58.)

[75]   (*Id.* at 59 and 64.)

[76]   (A. Cottrell Dep. at 33;  *see also* D. Huffman Dep. at 40.)

daughter was still at school, so Amanda also called the school and warned them about what had happened so that they could "get [that] daughter . . . and keep her safe at the school . . . ,"[77] in response to which the school went into "lock down."[78]   The Huffmans also retrieved their children from school and barricaded themselves in, "knowing that [Bernard] was on the way to [their] house."[79]   While this was going on, Bradley's wife[80] and sister-in-law[81] called Wood County 911 to report the violent encounter.[82]   Wood County Sheriff's deputies arrived at Bradley's house,[83] and Bradley and his family told them about the encounter, including that Bernard "had showed up with a shotgun."[84]

Also during this time, Deborah and Virginia went to obtain a mental hygiene petition against Bernard.[85]   Senior Trooper Nathan Scott Stepp ("Trooper Stepp") was in court that day and learned about the mental hygiene petition against Bernard,[86] and Trooper Hartley also contacted Trooper Stepp to request assistance serving the mental hygiene.[87]

Deborah also made the first of what would be several calls to Deputy Hickman on his cell phone.[88]   She first told Deputy Hickman that Bernard "had called her and said he was going to kill himself and hung up the phone."[89]   So Deputy Hickman and Trooper Hartley called Bernard's house to check on him.[90]   When they could not reach him by phone, they decided to

---

[77]   (A. Cottrell Dep. at 33–34;  K. Dye Dep. at 23.)
[78]   (A. Cottrell Dep. at 34;  K. Dye Dep. at 33.)
[79]   (O. Huffman Stmt. at 2.)
[80]   (A. Cottrell Stmt. at 11.)
[81]   (B. Cottrell Stmt. at 21–22;  A. Cottrell Stmt. at 10–11.)
[82]   (Compl. ¶ 22;  B. Cottrell Dep. at 63–64;  K. Dye Dep. at 14–15.)
[83]   (B. Cottrell Dep. at 65–66.)
[84]   (*Id.* at 66;  K. Dye Dep. at 15–16.)
[85]   (D. Huffman Dep. at 66;  V. Cottrell Stmt. at 2;  B. Cottrell Dep. at 26;  O. Huffman Stmt. at 3;  B. Cottrell Stmt. at 5–6.)
[86]   (N. Stepp Dep. at 25.)
[87]   (*Id.* at 25–26.)
[88]   (R. Hickman Dep. at 29–30.)
[89]   (*Id.* at 30.)
[90]   (*Id.* at 31.)

drive to his house.  As they were refueling Deputy Hickman's cruiser, they bumped into Orland

Huffman, Sr., Deborah's father-in-law,[91] who also warned them that Bernard was dangerous.[92]

They eventually arrived at Bernard's house, but both Bernard and his car were gone.[93]

Amanda called Deborah.  Amanda was hysterical and "yelling and screaming and

just—I had no idea what was going on."[94]  Deborah misunderstood Amanda to have said that

Bernard not only had a shotgun but had also fired it.[95]  So Deborah made a second telephone call

to Deputy Hickman.[96]  Deborah was then hysterical, "extremely upset and talking really, really

loudly and fast."[97]  She told Deputy Hickman and Trooper Hartley that Bernard was at Bradley's

house "shooting," "He is there shooting up my brother's house."[98]  "I know that when we got off

the phone [with Deborah], she stated that she was afraid that he was going to come back and hurt

her, and during that discussion, she advised that he said he wasn't going to go down easy and

stated something along the lines of suicide-by-cop and was psychologically unstable."[99]  Trooper

Hartley passed this information along to Trooper Stepp for his safety.[100]

The officers had learned about the mental hygiene petition for Bernard, so they

formulated a plan where Trooper Hartley and Deputy Hickman would proceed north on Route 14

to the Roane County-Wirt County line and wait on Bernard, who, as noted, they believed to be in

route from Wood County to the Huffmans' house in Roane County to harm the Huffmans.[101]

While in route, they learned that Bernard had not fired his shotgun at his son's family, but had

---

[91]     (*Id.* at 95.)

[92]     (*Id.* at 76–77.)

[93]     (*Id.* at 34–35;  N. Stepp Dep. at 34;  Z. Hartley Dep. at 27.)

[94]     (D. Huffman Dep. at 40–42.)

[95]     (*Id.* at 42;  *accord* O. Huffman Stmt. at 2;  O. Huffman Stmt. at 2.)

[96]     (R. Hickman Dep. at 33.)

[97]     (*Id.* at 33.)

[98]     (*Id.* at 33–34;  *see also* Z. Hartley Dep. at 20–21 and 24;  D. Huffman Dep. at 42–43.)

[99]     (Z. Hartley Dep. at 25.)

[100]    (*Id.* at 25.)

brandished it, pointed it at them, and threatened to kill them.[102]  Trooper Stepp also eventually headed north to assist Trooper Hartley and Deputy Hickman.[103]

At the county line, Trooper Hartley and Deputy Hickman saw Bernard driving south on Route 14.[104]  They attempted to stop Bernard using the cruiser's blue lights, but Bernard refused to stop,[105] illegally passing the vehicle in front of him by crossing into oncoming traffic, so Deputy Hickman activated his siren.[106]  Still, Bernard refused to stop, continuing to alternate between his own lane and the oncoming vehicles' lane.[107]  Bernard's speed fluctuated wildly, from 40 to 80 MPH in the 55 MPH zone.[108]  Trooper Hartley was relaying information about the pursuit via radio to dispatchers and other officers.[109]

The pursuit eventually passed Trooper Stepp, still traveling north, so he turned around and joined.[110]  When Bernard reached the turnoff for his house, he swerved as if he was going to make the turn, but at the last second, he swerved back onto Route 14 and continued south at high speed.[111]  When Bernard reached the area of Randolph Road and Route 14—*i.e.*, a little over five miles from the intersection of Route 14 and Folly Run, where the officers had started their pursuit—he again slowed and started to turn as if going down Randolph Road, but again he did not do so, and instead tried to make a three-point U-turn.[112]

---

| | |
|---|---|
| 101 | (R. Hickman Dep. at 35–37;  Z. Hartley Dep. at 21, 23, 28;  N. Stepp Dep. at 31.) |
| 102 | (*See, e.g.*, R. Hickman Dep. at 42–44;  N. Stepp Dep. at 32–33;  Z. Hartley Dep. at 23 and 26.) |
| 103 | (R. Hickman Dep. at 37–39;  Z. Hartley Dep. at 23;  N. Stepp Dep. at 36–39.) |
| 104 | (R. Hickman Dep. at 40–41;  Z. Hartley Dep. at 28.) |
| 105 | (R. Hickman Dep. at 42–44.) |
| 106 | (*Id.* at 44.) |
| 107 | (*Id.* at 45–46;  N. Stepp Dep. at 40.) |
| 108 | (R. Hickman Dep. at 44–45;  N. Stepp Dep. at 40–43;  Z. Hartley Dep. at 29.) |
| 109 | (R. Hickman Dep. at 45–46;  Compl. ¶ 22.) |
| 110 | (R. Hickman Dep. at 47–48;  Z. Hartley Dep. at 31.) |
| 111 | (R. Hickman Dep. at 46–47.) |
| 112 | (*Id.* at 47;  Z. Hartley Dep. 32–33.) |

What happened next all unfolded in a matter of just seconds. Trooper Stepp's cruiser was roughly head-to-head with Bernard's car, and Trooper Stepp saw that Bernard was holding what Trooper Stepp (correctly) believed was Bernard's shotgun in his right hand.[113] So Trooper Stepp decided to ram Bernard so that he could neither escape nor maintain control of the shotgun and shoot anyone.[114] Bernard, however, still refused to go peacefully. Instead, he accelerated into Trooper Stepp's cruiser and tried to push Trooper Stepp back.[115] Deputy Hickman positioned his cruiser so Bernard could not flee south.[116]

After all of the vehicles finally came to a stop, all of the officers exited their cruisers at about the same time.[117] Deputy Hickman could see Bernard moving around in his vehicle, but his view of exactly what Bernard was doing was obstructed by the "A pillar" (the vertical parts of the car between the left edge of the windshield and the front edge of the driver's window).[118] Neither Trooper Stepp's nor Trooper Hartley's views, however, were obstructed. Based on believed was the shotgun in Bernard's hand[119] and the fact that Bernard was pointing it at Trooper Stepp,[120] plus everything else that he had learned about Bernard earlier, Trooper Stepp fired: "Q: . . . At what point, then, do you fire your weapon for the first time? A: Once that gun starts coming down at me."[121] Stepp also simultaneously shouted to the other officers that Bernard still had his gun.[122]

Trooper Hartley could see what Trooper Stepp saw:

---

[113]    (N. Stepp Dep. at 46–49;  *accord* Report of Criminal Investigation at 3–4 (attached as Ex. N).)

[114]    (N. Stepp Dep. at 50;  *see also* Compl. ¶ 23;  R. Hickman Dep. at 47–49;  Z. Hartley Dep. at 33.)

[115]    (N. Stepp Dep. at 51–52;  *accord* Z. Hartley Dep. at 42.)

[116]    (R. Hickman Dep. at 47.)

[117]    (N. Stepp Dep. at 55;  R. Hickman Dep. at 51;  Z. Hartley Dep. at 36–37.)

[118]    (R. Hickman Dep. at 53–54.)

[119]    (*See* Compl. ¶ 42;  B. Cottrell Dep. at 76.)

[120]    (N. Stepp Dep. at 52–54.)

[121]    (*Id.* at 55;  Compl. ¶ 24.)

[122]    (Z. Hartley Dep. at 40;  *accord* N. Stepp Dep. at 54.)

> So once I exited Deputy Hickman's passenger side door, as I was
> exiting, I heard Trooper Stepp yell, "Gun, gun, gun." He began to
> fire. That's when I locked my attention on Mr. Cottrell. I could
> see the camouflage stock. At that point in time, we didn't know if
> it was a rifle or a shotgun, but it appeared to be laying on the driver
> dash—or excuse me—the dashboard. His right hand was on the
> stock of the firearm. I can't say that it was grasping the trigger, but
> it was in that area. That's when I engaged.

(Z. Hartley Dep. at 37.)[123]

Deputy Hickman was also well aware of what had happened over the course of the previous day and that Bernard was schizophrenic and determined to shoot the officers to provoke them to shoot him. So as soon as he heard Trooper Stepp shout "Gun!" and heard the Troopers shooting, Deputy Hickman also began firing.[124]

Bernard stopped moving and his head tilted forward, so the officers ceased fire.[125] Trooper Stepp used his baton to break out Bernard's window,[126] and he pried the shotgun (which was loaded and had a shell chambered and ready to fire[127]) from Bernard's right hand.[128] Trooper Stepp removed Bernard from the vehicle[129] and found no pulse.[130] Deputy Hickman saw that Bernard's tires were still spinning from Bernard's effort to ram Trooper Stepp, so he placed Bernard's car in park and turned it off.[131]

---

[123]  (*See also id.* at 43 ("Q: So you were able to see throughout the course of you firing that Mr. Cottrell's hand remained on— A: Yes. Q:—the stock? A: Yes, ma'am."); *id.* at 38 (describing seeing that "[t]he right hand was on what appeared to be—it was a camouflage stock"); *id.* at 39–40 (noting that Bernard was pointing the shotgun forward—*i.e.*, about where Stepp was standing (Z. Hartley Dep. at 56); *id.* at 55 ("Q: Did it appear to you that he was trying to use the dash as a rest for the gun to fire it? A: Yes, sir."); *id.* at 58 (describing that a shotgun covers a large area and thus does not have to be pointed especially accurately).)

[124]  (R. Hickman Dep. at 51–53; Compl. ¶ 30.)

[125]  (N. Stepp Dep. at 62 and 64; Z. Hartley Dep. at 45.)

[126]  (N. Stepp Dep. at 64; R. Hickman Dep. at 59.)

[127]  (O. Starsick Dep. at 26–27.)

[128]  (R. Hickman Dep. at 61–62; Z. Hartley Dep. at 48; N. Stepp Dep. at 65–67.)

[129]  (N. Stepp Dep. at 70.)

[130]  (*Id.* at 70.)

[131]  (R. Hickman Stmt. (attached as Ex. M); *accord* O. Starsick Dep. at 29–31 (attached as Ex. K).)

## II. ANALYSIS

### A.     Qualified immunity.

Qualified immunity shields police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[132]  The doctrine affords officers " 'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' "[133]  It insulates them from "bad guesses in gray areas," ensuring that they are only liable "for transgressing bright lines."[134]  "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued."[135] "Where there is a legitimate question as to whether the officer's conduct would objectively violate the plaintiff's right, qualified immunity 'gives police officers the necessary latitude to pursue their [duties] without having to anticipate, on the pain of civil liability, future refinements or clarifications of constitutional law.' "[136]  "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful."[137]  "This inquiry is a pure question of law and 'hence always capable of decision at the summary judgment stage.' "[138]

### B.     Trooper Stepp and Trooper Hartley are entitled to judgment as a matter of law on Count I, "excessive force under 42 U.S.C. §1983."

The Fourth Amendment proscribes only "unreasonable" force.[139]  "The standard of review is an objective one," and "the question is whether a reasonable officer in the same

---

[132]     *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
[133]     *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).
[134]     *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).
[135]     *Hunter*, 502 U.S. at 229.
[136]     *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (alteration in *Slattery*).
[137]     939 F.2d at 216.
[138]     *DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir. 1995) (citations omitted).
[139]     U.S. CONST. am. IV;  *see also Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

circumstances would have concluded that a threat existed justifying the particular use of force."[140] Even deadly force is reasonable "when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others."[141] "In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed,"[142] not some earlier point when the police might have done something differently. "A reviewing court may not employ 'the 20/20 vision of hindsight' and must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.' "[143] "The court's focus should be . . . on the fact that officers on the beat are not often afforded the luxury of armchair reflection."[144]

       Trooper Stepp and Trooper Hartley knew that Bernard Cottrell had a serious psychiatric disorder and was clearly in the throes of dangerous psychiatric event. They knew that he had beaten his wife. They knew that he had promised to kill his family if they took his wife away from him, and they knew that he felt his family had done just that. They knew that he had already been to his son's family's house, pointed a shotgun at them, and threatened to kill them. They knew that Bernard was on his way to his daughter's family's house, presumably to make good on his threat. They knew that he fled from their effort to stop him, endangering the other drivers on the road. And they knew that he was hearing voices that were telling him what to do and that he intended to commit suicide by forcing a violent confrontation with police.

       Any objectively reasonable officer in Trooper Stepp's or Trooper Hartley's shoes, knowing everything that they knew, could easily have concluded that that was a shotgun in Bernard's hand and that he was not afraid to use it against the police. Plaintiff will undoubtedly

---

[140]   99 F.3d at 642 (citation omitted).

[141]   *Id.* (citation omitted).

[142]   *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (citations omitted).

[143]   99 F.3d at 642 (citations omitted).

argue that the officers were less than completely certain that the object they saw was definitely the camouflaged shotgun that the family told them Bernard was indeed carrying.  But the Fourth Amendment requires only reasonableness.  That was the case in *Slattery*, for example, where the Fourth Circuit "held that an officer reasonably felt threatened in a situation where he could not see the suspected weapon at all."[145]  There, officer Rizzo was involved in a drug bust.  He had recently been involved in a previous such bust where guns were found.  When he approached Slattery, he could see that Slattery had something in his hand, but could not see what.  When Slattery turned toward Rizzo, Rizzo shot and killed Slattery.  Slattery was holding a beer bottle. The Fourth Circuit reversed the district court's refusal to grant Rizzo qualified immunity, holding that under the totality of the circumstances, an objectively reasonable officer in Rizzo's shoes could have believed that Slattery presented a danger.[146]

Plaintiff criticizes Trooper Stepp and Trooper Hartley for failing to "deescalate" the situation.[147]  But the Fourth Amendment does not require officers to make such efforts when confronted with an armed, suicidal, self-admittedly dangerous man.  As the Fourth Circuit said in *Elliott*, when a reviewing court indulges in speculation about what else the officers might have done to deescalate the situation or what else the suspect might have done other than shoot the officers, such a "suggestion that the officers might have responded differently is exactly the type of judicial second look that the case law prohibits."[148]  Furthermore, such speculation violates the requirement that what happened (or did not happen) leading up to the very instant that force was used is irrelevant to the determination of whether that force was reasonable:

---

[144]   *Id.* (citations omitted).
[145]   *Id.* at 643.
[146]   939 at 213–15 and 216–17.
[147]   (Compl. ¶ 27.)
[148]   99 F.3d at 643.

14

> [*Graham v. Connor*, 490 U.S. 386 (1989),] requires us to focus on
> the moment force was used; conduct prior to that moment is not
> relevant in determining whether an officer used reasonable force.
> [W]e [have] specifically rejected [the] argument that Officer
> Ruffin's failure to obtain proper backup and employ a flashlight
> was relevant:  In light of "the Supreme Court's focus on the very
> moment when the officer makes the 'split-second judgments,' . . .
> events which occurred before Officer Ruffin opened the car door
> and identified herself to the passengers are not probative of the
> reasonableness of Ruffin's decision to fire the shot."

99 F.3d at 643–44 (citations omitted) (alterations in original).  In *Scott v. Harris*, 550 U.S. 372

(2007), for example, Harris argued that deadly force is only reasonable if it had "been necessary

to prevent escape" and that "the officer must have given the suspect some warning."[149]  The

Court rejected any such rigid requirements.[150]  In response to Harris's argument that Scott could

have backed down instead of engaging Harris, the Court said: "We think the police need not

have taken that chance and hoped for the best."[151]

      In fact, Harris's underlying transgression was far less serious than Bernard's.

Harris was speeding.[152]  Bernard was not just only speeding but had in the past day demonstrated

that he was out of his mind and determined to do whatever it took to force the police to kill him.

The police chased Harris, but—like Bernard—Harris fled.[153]  Scott rammed Harris's car, and

Harris consequently wrecked and was severely injured.  The Court concluded:

> [W]e are loath to lay down a rule requiring the police to
> allow fleeing suspects to get away whenever they drive so
> recklessly that they put other people's lives in danger.  It is
> obvious the perverse incentives such a rule would create:  Every
> fleeing motorist would know that escape is within his grasp, if only
> he accelerates to 90 miles per hour, crosses the double-yellow line
> a few times, and runs a few red lights.  The Constitution assuredly

---

[149]    550 U.S. at 382.

[150]    *Id.* at 382–83.

[151]    *Id.* at 385.

[152]    *Id.* at 374.

[153]    *Id.* at 374–75.

does not impose this invitation to impunity-earned-by-recklessness.

550 U.S. at 385–86.  The Court went on to again recognize that even deadly force is reasonable if it happens while an officer is attempting to guard the lives of others.

Even discounting Bernard's dangerous flight from the officers pursuing him immediately before the encounter, an objectively reasonable officer in Trooper Stepp's and Trooper Hartley's shoes could easily have concluded that Bernard was about to shoot them.

### C.   First Sergeant Starsick is entitled to judgment as a matter of law on Count II, "supervisory liability under 42 U.S.C. § 1983."

To prove a § 1983 claim of supervisory liability, a plaintiff must prove:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Up to this point, West Virginia State Police First Sergeant Okey S. Starsick's name has been conspicuously absent, because other than participating in the post-incident investigation, First Sergeant Starsick") had no involvement in this case.  Within the State Police, each district is made up of three or four counties, and each district's commander ensures that administrative tasks within the district are completed, and (as here) he investigates the discharge of a firearm by a Trooper within his district.[154]

In 2016, First Sergeant Starsick was the district commander for the district that encompassed Trooper Stepp's and Trooper Hartley's patrols.  Starsick oversaw three or four

---

[154]   (O. Starsick Dep. at 6–7.)

sergeants, who in turn oversaw about a dozen State Troopers, including Trooper Stepp and Trooper Hartley.[155]   Starsick was thus not Trooper Stepp's or Trooper Hartley's immediate supervisor, so he had little contact with them.[156]   Furthermore, his role did not involve disciplining Troopers as the result of any investigation that he might conduct;  instead, it was limited to submitting a report up the chain of command ultimately to the Colonel (the head of the State Police) for final disposition.[157]   As for the September 2016 incident itself, Starsick's first involvement was after the fact, when he heard that shots had been fired, requested that the Crime Scene Team respond, and proceeded to the scene to begin his investigation.[158]

First, then, because neither Trooper Stepp nor Trooper Hartley violated Bernard's constitutional rights, First Sergeant Starsick has no supervisory liability.[159]   Second, Plaintiff has identified no evidence that Starsick had any knowledge that either Trooper Stepp or Trooper Hartley posed "a pervasive and unreasonable risk" of constitutional injury to Bernard, because before the incident, First Sergeant Starsick had received zero complaints about the use of excessive force by either Trooper Stepp[160] or Trooper Hartley.[161]   *A fortiori*, Plaintiff cannot prove a deliberately indifferent or tacitly approving response, or a causal link.[162]

### D.   Trooper Stepp and Trooper Hartley are entitled to judgment as a matter of law on Count IV, "state constitutional violations."

Plaintiff claims that Trooper Stepp's and Trooper Hartley's use of force also violated W. VA. CONST. Art. III § 6.[163]   "The language of Article III, Section 6 of the West

---

[155]     (*Id.* at 7–8.)

[156]     (*Id.* at 15.)

[157]     (*Id.* at 39–41 and 59–60.)

[158]     (*Id.* at 19–22.)

[159]     *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

[160]     (O. Starsick Dep. at 61–65 (describing only one case, which happened after September 2016, *see* N. Stepp Dep. at 20–21).)

[161]     (O. Starsick Dep. at 63.)

[162]     *See also* 13 F.3d at 799 (describing what is needed to meet the "heavy burden" to prove element (1)).

[163]     The Court previously dismissed Count IV insofar as Plaintiff relies on W. VA. CONST. Art III § 10.

Virginia Constitution is very similar to the Fourth Amendment to the Constitution of the United States."[164]   Thus, the West Virginia Supreme Court of Appeals "has traditionally construed Article III, Section 6 in harmony with the Fourth Amendment."[165]   For the same reasons that Count I fails, then, so too does Count IV.

     **E.**     **Trooper Stepp and Trooper Hartley are entitled to judgment as a matter of law on Count V, "battery."**

The West Virginia Code provides that "[i]n addition to the causes of action which survive at common law, causes of action for . . . injuries to the person and ***not*** resulting in death . . . also shall survive; and such actions may be brought notwithstanding the death of the person entitled to recover or the death of the person liable."[166]   The necessary implication of this is that causes of action for injuries a person and ***resulting*** in death do *not* survive.[167]   Thus, "[t]he battery claim brought by Mr. [Cottrell's] estate cannot proceed because West Virginia claims for battery do not survive death."[168]   Count V therefore fails to state a claim for which any relief could possibly be granted.[169]

Furthermore, police officers are privileged to engage in conduct that might otherwise constitute battery if their conduct is objectively reasonable.[170]   As demonstrated *supra*, Trooper Stepp and Trooper Hartley did not act unreasonably against Bernard.   So even if Count V had not abated, it still would lack merit.

---

[164]    *State v. Duvernoy*, 156 W. Va. 578, 582, 195 S.E.2d 631, 634 (1973) (citation omitted).

[165]    *Id.* (citation omitted).

[166]    W. Va. Code § 55-7-8a(a) (emphasis added).

[167]    *See, e.g.*, *Finney v. MIG Capital Mgmt., Inc.*, No. 2:13-CV-02778, 2014 WL 1276159, at *5 (S.D. W. Va. Mar. 27, 2014) (noting that only "***non-fatal*** personal injury" claims survive) (emphasis added).

[168]    *Spry v. West Virginia*, No. 2:16-CV-01785, 2017 WL 1483370, at *9 (S.D. W. Va. Apr. 24, 2017).

[169]    In boilerplate fashion, Plaintiff demands "all damages recoverable under the West Virginia wrongful death statute, W. Va. Code § 55-7-6." (Compl. ¶ 86 (Count V); *see also* Compl. ¶ 53 (same for Count I), ¶ 59 (Count II), ¶ 73 (Count III), ¶ 82 (Count IV), ¶ 92 (Count VI), ¶ 105 (Count VII).)  Plaintiff has *not*, however, filed a wrongful death cause of action against anyone.  (*See generally* Compl.)  Even if he had, a claim for wrongful death requires wrongful conduct, and as shown, Defendants' conduct was not wrongful toward Bernard.

[170]    *See Kaufman v. United States*, No. 1:12-CV-0237, 2014 WL 66639, at *8 (S.D. W. Va. Jan. 8, 2014).

**F.      Trooper Stepp and Trooper Hartley are entitled to judgment as a matter of law on Count VI, "negligence."**

Like a claim for battery, a claim for negligence causing death also abates.[171] Count VI therefore likewise fails to state a claim for which any relief could possibly be granted.

And even if Count VI did not abate, and to whatever extent Count VI might survive syl. pt. 6, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995), Trooper Stepp and Trooper Hartley are still entitled to judgment as a matter of law, because negligence requires unreasonableness.[172]  That is, reasonable conduct is by definition not negligent conduct.[173]  The Court previously put off dismissing Count VI because Plaintiff had *alleged* negligence.  In the intervening time, however, Plaintiff has identified no *evidence* to back up his allegations—that is, Plaintiff has failed to place into reasonable dispute any material fact showing that Trooper Stepp or Trooper Hartley acted unreasonably.  As demonstrated *supra*, the Troopers acted reasonably.  So even if Count VI had also not abated, it also still would lack merit.

### III. CONCLUSION

The Fourth Amendment does demands neither perfection nor prognostication from police officers facing a very dangerous situation that unfolds in just seconds:

> [N]o court can expect any human being to remain passive in the face of an active threat on his or her life.  . . . [T]he Fourth Amendment does not require omniscience.  Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.

---

[171]      *See, e.g.*, *Hoover v. Trent*, No. 1:07-CV-47, 2008 WL 2992987, at *5 (N.D. W. Va. Aug. 1, 2008).

[172]      *See Strahin v. Cleavenger*, 216 W. Va. 175, 183, 603 S.E.2d 197, 205 (2004).

[173]      *See, e.g.*, *Gonzalez v. Conley*, 199 W. Va. 288, 293, 484 S.E.2d 171, 176 (1997).

*Elliott*, 99 F.3d at 644.  Plaintiff plainly understood this when the shoe was on the other foot:  "If I would have felt threatened, I would have shot him."[174]  Defendants are entitled to nothing less. Trooper Stepp, Trooper Hartley, and First Sergeant Starsick respectfully request the Court to **GRANT** their motion and to **ORDER** that summary judgment be entered in their favor.

**NATHAN SCOTT STEPP, ZACH W. HARTLEY,** *and* **OKEY S. STARSICK,** **By counsel,**

**STEPTOE & JOHNSON PLLC** *Of Counsel*

**/s/ Michael D. Mullins**

Michael D. Mullins (W. Va. Bar No. 7754)
*michael.mullins@steptoe-johnson.com*
Robert L. Bailey (W. Va. Bar No. 8902)
*robert.bailey@steptoe-johnson.com*
707 Virginia St. E. 17th Floor
P.O. Box 1588
Charleston, W. Va. 25326-1588
(304) 353-8000 (voice)
(304) 353-8180 (facsimile)

---

[174]     (B. Cottrell Dep. at 107.)