IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

BRADLEY COTTRELL,
on behalf of the Estate of,
BERNARD DALE COTTRELL,

                  Plaintiffs,

v.                                                                                     CIVIL ACTION NO. 2:18-cv-01281

NATHAN SCOTT STEPP,
Individually as a member of the
West Virginia State Police, et al.,

                  Defendants.

**ORDER**

Pending before the Court are Defendant Hickman's Motion for Summary Judgment, (ECF No. 78), and Defendants Stepp, Hartley, and Starsick's Motion for Summary Judgment, (ECF No. 80). For the reasons set forth below, the motions are **GRANTED**.

        *I.*        **BACKGROUND**

This action arises out of events occurring over two days in September 2016 in Roane County, West Virginia, culminating with the death of Bernard Dale Cottrell during a standoff with the police.

*A.  September 5, 2016*

On September 5, 2016, the chain of events leading to Bernard's death kicked off with a call from Amanda Cottrell—Bernard's daughter-in-law—to the local police. (ECF No. 79 at 1.)

1

Amanda called to report a "domestic disturbance" between Bernard and his wife, Virginia Cottrell. (*Id.*) Amanda informed police that her husband, Bradley Cottrell—Bernard's son and Plaintiff in this matter—and her sister-in-law, Deborah Huffman—Bernard's daughter—were driving to Bernard and Virginia's home to remove Virginia—Bradley and Deborah's mother—for her safety. (*Id.*)

Earlier in the day, Virginia had asked Bradley to come get her because Bernard had physically abused her and threatened to hurt her if she was not taken from the house. (ECF No. 81 at 1.) As part of her call to the police, Amanda requested that an officer be sent to help safely remove Virginia from the residence. (ECF No. 79 at 1-2.) Likewise, Orland "Buddy" Huffman—Bernard's son-in-law and Deborah's husband—also called the police seeking assistance getting Virginia out of the home. (*Id.* at 2.) Shortly after Buddy's call, Deborah and Buddy then headed to the house. (ECF No. 81 at 2.) After Amanda's call, Deputy Robert B. Hickman and Trooper Zach W. Hartley were dispatched to Bernard's home "to see if Virginia was in danger and to check on her well-being." (*Id.*)

In total, three separate groups headed toward Bernard's residence to ensure that Virginia was safely able to leave the home: (1) Bradley; (2) Deborah and Buddy; and (3) Deputy Hickman and Trooper Hartley.

Bradley was the first to arrive. He retrieved the noticeably bruised Virginia, and the pair quickly left without speaking to Bernard. (ECF No. 81 at 2.)

Deborah and Buddy arrived next. By this time, Bradley had already taken Virginia and gone. (ECF No. 81 at 2.) So, Deborah and Buddy turned around and went back to town. (*Id.*)

On their way, Deborah and Buddy crossed paths with Deputy Hickman and Trooper Hartley, who were still heading to Bernard's. (ECF No. 81 at 2-3.) The officers instructed Deborah and Buddy to wait at a nearby grocery store while they continued to Bernard's home. (*Id.* at 3.) When the officers arrived at the residence, they spoke with Bernard, who displayed aggressive behavior in the interaction. (*Id.*) Eventually, Bradley returned to Bernard's house and told the police what had happened. (*Id.*) Bradley and the officers then left Bernard's home and went to meet the Huffmans at the grocery store. (*Id.*)

There, Deputy Hickman and Trooper Hartley were informed that Bernard had mental health issues and potentially "had guns throughout the house." (ECF No. 81 at 3.) Virginia also told the officers that Bernard had "put his hands on her legs" but denied that she had been physically assaulted that day. (ECF No. 82 at 3-4.) In response to the situation, Deputy Hickman advised the family members about the process for receiving a domestic violence petition against Bernard. (ECF No. 79 at 2.) The officers and family members then left the grocery store parking lot and had no further interactions with one another on that day. (*Id.*)

B. *September 6, 2016*

On the following day, September 6, 2016, Deborah called Deputy Hickman's cell phone while he was responding to an unrelated situation and told him that Bernard had threatened suicide. (ECF No. 79 at 3.) Expecting that Deborah would seek a mental hygiene petition, Deputy Hickman—along with Trooper Hartley—returned to the Roane County Sheriff's Department Office, which was closer to Bernard's home. (*Id.*) As the officers predicted, Deborah called Deputy Hickman again. This time, she informed them that Amanda had reported

3

Bernard went to Amanda's house armed with a gun and that he had fired the weapon into the air. (*Id.*)

However, unbeknownst to Deputy Hickman and Trooper Hartley, Bernard did not actually discharge the weapon while at Amanda's house. (ECF No. 82 at 5.) Instead, Bernard had shouted, aimed the gun at the house, and threatened to kill the family but left without actually shooting. (ECF No. 81 at 5.) Believing that Bernard was next headed to her home, Deborah additionally reported that Bernard was planning "something along the lines of suicide-by-cop" and that she was "afraid that he was going to . . . hurt" her and her family. (ECF No. 81 at 8.)

After informing Roane County 911 to have an officer dispatched to Bradley's home, Deputy Hickman and Trooper Hartley called Bernard's phone. (ECF No. 81 at 7-8.) When there was no answer, they set out for the residence to perform a wellness check. (*Id.*) Also, around this time, the two officers contacted Trooper Nathan Scott Stepp for assistance and brought him up to speed on the day's events. (ECF No. 81 at 7.)

Upon arriving at Bernard's house, Deputy Hickman and Trooper Hartley discovered that Bernard's vehicle was not on the property. (ECF No. 81 at 8.) The two headed to a location they anticipated Bernard would travel on the way to the Huffmans' house, where Deborah had worried Bernard's rampage would continue. (*Id.*) At the location, Deputy Hickman and Trooper Hartley parked their vehicle and waited "with the intent to initiate a traffic stop" when they saw Bernard. (ECF No. 79 at 4.) While driving there, the officers learned that Bernard had not actually fired shots at Amanda and Bradley's home but merely threatened to kill them while brandishing and aiming the firearm. (ECF No. 81 at 8-9.)

4

Before long, the officers' prediction about Bernard's travel route proved correct. Bernard passed their parked vehicle, and the officers attempted a traffic stop. (ECF No. 79 at 4.) This did not dissuade Bernard though, and he ignored the officers, who in turn began pursuit with their siren active. (ECF No. 81 at 9.) This initiated a chase, and Bernard illegally passed a vehicle and repeatedly alternated lanes to try to evade the officers. (*Id.*) While fleeing, Bernard's vehicle reached dangerous speed levels, at one point going as fast as 80 miles-per-hour in a 55 mile-per-hour zone. (*Id.*)

A few minutes into the pursuit, Trooper Stepp—who had not yet met up with the other officers—drove past the chase. (ECF No. 82 at 6.) He immediately turned his vehicle around and joined the other officers in following Bernard. (*Id.*) To end the chase, they devised a plan to have backup create a roadblock at an upcoming choke point and cut off Bernard's progress. (*Id.* at 6-7.) Before this could happen though, Bernard stopped his vehicle and tried to execute a three-point turn. (*Id.* at 7.)

In the seconds after Bernard began attempting his turn, Trooper Stepp identified what he believed—and what later was confirmed to be—a shotgun in Bernard's right hand. (ECF No. 81 at 10.) Trooper Stepp further believed that Bernard was attempting to aim the weapon at the officers. (ECF No. 82 at 7.) To prevent further danger and bring the chase to an end, Trooper Stepp rammed into Bernard's vehicle. (*Id.*) The plan worked, and Bernard's vehicle was brought to a halt, with the police vehicles soon following suit. (*Id.* at 8.)

The events that followed occurred rapidly over mere moments. Each officer has a slightly different version of what happened, based on their perspective and position.

To begin, Trooper Stepp exited his vehicle and almost instantly observed again that Bernard was holding a weapon and attempting to point it at the officer. (ECF No. 79 at 7.) To alert his fellow officers, Trooper Stepp yelled, "Gun, gun, gun." (*Id.* at 7-8.) At the same time, he began to fire. (*Id.* at 8.) During the shootout, Trooper Stepp says that Bernard "continued to track" him "with the barrel of the shotgun" he was brandishing. (*Id.* at 8.)

Like Trooper Stepp, Trooper Hartley stepped out of his vehicle and observed movement from Bernard's vehicle. (ECF No. 82 at 8.) Again echoing Trooper Stepp, Trooper Hartley also testified that he saw Bernard holding a "big shotgun." (*Id.*) Additionally, Trooper Hartley confirmed that Trooper Stepp alerted the officers out loud to the presence of the gun. (*Id.*) At this time, Trooper Hartley noticed that Bernard had his "hand on the stock of the firearm" and began firing. (*Id.*) Trooper Hartley did not testify as to the exact direction the barrel was pointing, but he did confirm that the shotgun was in Bernard's hands at the time of the shooting. (*Id.* at 9.)

For his part, Deputy Hickman likewise got out of his vehicle and noticed that Bernard was moving, but his vision was partially obstructed by Bernard's vehicle. (ECF No. 81 at 10.) Deputy Hickman did however hear Trooper Stepp shout that Bernard had a gun. (ECF No. 79 at 8.) Deputy Hickman also of course heard Trooper Stepp's gunfire, so in response to Trooper Stepp's callout and active fire, Deputy Hickman began shooting at Bernard's vehicle. (ECF No. 81 at 11.)

The shooting stopped when the officers noticed that Bernard quit moving and slumped forward. (ECF No. 81 at 11.) The officers proceeded to retrieve the shotgun—which was loaded—from Bernard's right hand. (*Id.*) It was then that the officers determined that Bernard

had no pulse. (*Id.*) Finally, Deputy Hickman observed that Bernard's tires were still spinning, so he put the vehicle into park and turned it off, thus concluding the encounter. (*Id.*)

### C. Procedural History

Plaintiff Bradley Cottrell brought this action on behalf of the estate of his deceased father, Bernard Cottrell on September 6, 2018. (ECF No. 1.) The complaint contains seven counts: (I) excessive force against Trooper Stepp, Trooper Hartley, and Deputy Hickman; (II) supervisor liability against West Virginia State Police's First Sergeant Starsick; (III) *Monell* liability against the West Virginia State Police; (IV) West Virginia state constitutional violations against Trooper Stepp, Trooper Hartley, and Deputy Hickman; (V) battery against Trooper Stepp, Trooper Hartley, and Deputy Hickman; (VI) negligence on the part of Trooper Stepp, Trooper Hartley, and Deputy Hickman; and (VII) *Monell* liability against the Roane County Sheriff's Department. (*Id.*)

The motions for summary judgment regard the claims against the various individual officers. These motions have been fully briefed by both sides and are thus ripe for adjudication.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact." "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250 (1986). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores*, Inc., 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial ... by offering 'sufficient proof in the form of admissible evidence[.]' " *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### III. DISCUSSION

A total of five counts are brought against the officers in this case and are thus relevant to these motions. The Court will address each in turn.

#### A. Count I – Excessive Force

Count I alleges excessive force by Trooper Stepp, Trooper Hartley, and Deputy Hickman. As explained below, the Court determines that there was no unreasonable force in this case, and thus, qualified immunity protects the officers from liability.

##### a. Qualified Immunity

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Baltimore Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013) (citation omitted). This protection "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to

8

shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine whether qualified immunity applies, "courts engage in a two-step inquiry." *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016). The first step asks whether the facts, "taken in the light most favorable to the" nonmoving party, establish that the officer "violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second "step is to ask whether the right was clearly established." *Id.* These steps may be done in either order. *See Pearson*, 555 U.S. at 236 (modifying the *Saucier* test to allow courts to use discretion to decide the order in which to conduct the qualified immunity analysis). If the answer to either question counsels against the nonmoving party, qualified immunity applies.

In this case, the Court first determines whether the facts evince a constitutional violation. As explained further below, they do not.

### i. Fourth Amendment

The Constitution does not forbid "all searches and seizures," only "unreasonable searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222 (1960). Here, it is not disputed that Bernard was entitled to this protection, and it is further undisputed that Bernard experienced a seizure at the hands of the officers when they shot and killed him. Therefore, the question before the Court is whether Bernard's rights were "violated by an *unreasonable* . . . seizure." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (emphasis added).

Thus, because excessive force claims "aris[e] under the Fourth Amendment," they are reviewed in that context. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Under this standard, courts "analyze[] the constitutionality of the challenged application of force solely by reference

to the Fourth Amendment's prohibition against unreasonable seizures of the person." *Id.* at 395. This involves a "careful balancing" test. *Id.* at 396. Courts must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citations omitted).

The "test of reasonableness under the Fourth Amendment" is fact-driven and "is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 52, 559 (1979). So, courts must pay "careful attention" to the specifics of a case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted). For example, in situations where a "suspect poses a threat of serious physical harm to the officer or others," even deadly force may be used. *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

In addition, the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). Courts must make an "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The inquiry's "focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliot*, 99 F.3d at 642 (citations omitted).

Finally, the Fourth Amendment's reasonableness test "is an objective one." *Graham*, 490 U.S. at 397. "[T]he question is whether the officers' actions are objectively reasonable in light

of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citations omitted). As the Fourth Circuit has framed it, a seizure is reasonable if another "reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001) (citation omitted).

Put simply, do "the totality of the circumstances justif[y]" the "particular sort of . . . seizure" at hand?" *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). After considering the *Graham* factors, the Court's answer is the same for all three officers directly involved: Yes, the circumstances justified the seizure.

*First*, the Court looks to the severity of Bernard's underlying actions. *Graham*, 490 U.S. at 396. All three officers had the same information on this factor. By the time the officers had caught up to him, they knew that Bernard had committed multiple crimes. He had abused his wife, threatened to kill his son's family with a gun, and was apparently on the way to his daughter's house to do the same. (ECF No. 79 at 12, ECF No. 81 at 13.) Because of these crimes, the officers thus knew that Bernard was armed and hostile. This gave the officers more than enough "reason to believe that [Bernard] was a potentially dangerous individual." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015).

On top of his actions, the officers knew that Bernard was the subject of a mental hygiene petition. (ECF No. 81 at 7.) Bernard's "mental health was thus one of the 'facts and circumstances' that 'a reasonable officer on the scene' would" consider. *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (quoting *Graham*, 490 U.S. at 396). In fact, "it is a fact that officers *must* account for when deciding when and how to

11

use force." *Estate of Armstrong*, 810 F.3d at 900 (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004). In conjunction with his violent actions, it is clear that Bernard's mental health caused him to be an active danger to all those around him, and the officers were well aware of this fact as they approached him.

Because Bernard had committed several serious crimes and was seemingly on his way to commit more, the Court finds that the first factor weighs in favor of the officers.

*Second*, the Court asks whether the suspect poses an immediate threat to the safety of the officer or others. *Graham*, 490 at 396. Neither party disputes that Bernard had a gun in his truck and that he was holding it when the officers accessed his vehicle after the shooting. On top of that, Trooper Stepp reported that Bernard pointed his gun at the officer as he approached Bernard's vehicle, while Trooper Hartley confirmed seeing the gun in Bernard's grasp also. (ECF No. 79 at 7-8.)

With a gun pointed at him, "[a]ny reasonable officer in [Trooper Stepp's] position would have imminently feared for his safety and the safety of others." *Anderson*, 247 F.3d at 131. But even if the gun was not pointed at Trooper Stepp, the officers did "not have to wait until" it was "pointed at" them "before [they] [were] entitled to take action." *Id.* All three officers knew Bernard to be armed, and both Trooper Stepp and Trooper Hartley actually saw the weapon. (ECF 79 at 7-8.) Thus, the officers were justified when they "acted on the perception that [Bernard] had a [gun] in his hand." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998).

For his part, Deputy Hickman knew most of the same information about Bernard as the other two officers. The only difference is that he did not report seeing the weapon before the

12

shooting. However, this distinction is immaterial. When the shooting started, Deputy Hickman was faced with "a split-second decision in the context of a volatile atmosphere." *Sigman*, 161 F.3d at 788. Trooper Stepp's report that Bernard had a gun and the following shooting were more than enough to entitle Deputy Hickman to use deadly force, and he "acted reasonably by firing on [Bernard] as a protective measure before directly observing a deadly weapon." *Anderson*, 247 F.3d at 131. "Any reasonable officer in [his] position" would have done the same. *Id.*

Plaintiff attempts to undermine the officers' testimonies in two main ways: (1) through expert testimony from "certified accident reconstructionist" Dr. Jeremy J. Bauer who claims that his reconstruction indicates that Trooper Stepp's and Trooper Hartley's accounts do not align with his model, (ECF No. 82 at 12); and (2) by claiming that the testimonies of Trooper Stepp and Trooper Hartley are inconsistent, (*Id.* at 16.) The Court disagrees with Plaintiff's characterizations on both.

To begin, the testimony of Dr. Bauer does not preclude summary judgment as it fails to present any evidence of what occurred at the moment of the shooting, after the officers left their vehicles. (ECF No. 85 at 8). In fact, he specifically said that he did not know "what [the officers] could have seen once Trooper Stepp is standing and outside of the vehicle." (*Id.*) The same is true for Trooper Hartley as well. (*Id.*) Because he fails to offer any evidence about "the moment that the challenged force was employed," Dr. Bauer's evidence is irrelevant to the Court's analysis. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Even in the light most favorable to Plaintiff, Dr. Bauer's failure to contradict the officers' testimonies *at the*

13

*time of the shooting* creates no "genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citations omitted).

Further, the allegedly inconsistent testimonies of Trooper Stepp and Trooper Hartley do not create a genuine dispute of material fact. "In a rapidly evolving scenario such as this one," two witness's "account[s] of the event will rarely, if ever, coincide perfectly . . . because [they] [are] typically viewing the event from a different angle." *Anderson*, 247 F.3d at 130. Therefore, "minor discrepancies do not create a material issue of fact in an excessive force claim." *Id.* at 131.

The discrepancies here are certainly minor. They center on the idea that in some portions of their testimonies, the officers recounted seeing the weapon in different positions at different times and that the timing of Trooper Stepp's gun callout varies. (ECF No. 82 at 16.) The officers' testimonies aligned in every major respect about the events of the shooting, so the millisecond-by-millisecond timeline is not important. Similarly, the precise hand position of Bernard's grip on the gun changes nothing, either. He had the gun, and the officers knew it. Whether they got the exact placement of each of his fingers correct does not create a genuine dispute of material fact.

The testimony of the only other eyewitness to the events—Ashley Delany—bolsters this conclusion. Ashley confirms that Bernard was attempting to "make a U-turn or a three-point turn" when the police "blocked him in." (ECF No. 82 at 10 (citation omitted).) From there, she notes that the car seemed "stuck" and that the shooting occurred shortly after. (*Id.* at 11 (citation omitted).)

Though they align in all material respects, there are a couple small differences between Ashley's memory of the event and the officers' memory. This is expected given that Ashley's vision was blocked by a "big, big tree" making it so that she "couldn't see anything." (ECF No. 82 at 11 (citation omitted).) The obstruction caused Ashley to be unable to see inside of the vehicle, and so she did not testify as to what Bernard was doing within. Additionally, she stated that she "did not hear any of the officers say anything or give any warnings." (*Id.*) This is unsurprising given how quickly the situation unfolded and the fact that all Ashley could hear was the "sirens running." (*Id.*) Such "minor discrepancies do not create a material issue of fact . . . particularly when, as here, the witness views the event from a worse vantage point than that of the officers." *Anderson*, 247 F.3d at 131 (citation omitted). In other words, Ashley's "observations cannot effectively impact the credibility of [the officers'] testimon[ies] . . . as to [their] perceptions of what [they] saw from an entirely different—and closer—vantage point." *Sigman*, 161 F.3d at 788.

All considered, no set of facts can be created from the record that renders the officers' perception of extreme danger unreasonable.

Even putting aside the fact that the expert testimony and minor alleged inconsistencies do not create a genuine dispute of material fact, Plaintiff's argument simply misunderstands what is needed to justify the officers' actions in this case. The law does not "require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him." *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). In situations like this where "inaction could have resulted in death or serious injury to the officer and others," courts "will not second-guess the split-second judgment of a trained police officer." *Id.* at 1007-08. This would

15

be true even if "that judgment turns out to be mistaken." *Id.* at 1008. Thus, the uncontested fact that the officers were *correct* that Bernard was armed with a shotgun only solidifies a finding that Bernard posed a grave danger to them. *See Sigman*, 161 F.3d at 788 (finding support for an officer's belief that a suspect was armed where third-party affidavits failed to "dispute the fact that a [weapon] was recovered from the [area] near" the suspect).

Considering all this, the second factor also weighs in favor of the officers.

*Third* and finally, the Court also asks whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted). Bernard was mid-flight when the officers stopped him. Neither party disputes this. Further, even Plaintiff admits that Bernard "never attempted to get out of his vehicle" even after the officers exited theirs. (ECF No. 82 at 12.)

Bernard's actions created a "tense and dangerous situation" for the officers." *Sigman*, 161 F.3d at 787. Even in the light most favorable to Plaintiffs, there is no doubt that Bernard was a fleeing suspect, armed with a deadly weapon, who never once yielded to the officers. This is "active[] resist[ance]," and the third *Graham* factor is squarely on the side of the officers. 490 U.S. at 396.

After considering all three *Graham* factors and the totality of the circumstances leading up to Bernard's death, the Court concludes that Deputy Hickman, Trooper Hartley, and Trooper Stepp "reasonably perceived a threat to [their] safety and the safety of others and that [their] response[s] therefore [were] objectively justified and reasonable." *Sigman*, 161 F.3d at 787. Thus, no Fourth Amendment Violation occurred, and qualified immunity applies. Because "no

constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

    B. *Remaining Counts*

As discussed, the officers' actions were reasonable. Accordingly, the Court "need not address in any great length the" remaining claims stemming from Bernard's death. *Sigman*, 161 F.3d at 788. Still, the Court will touch on each other count and briefly explain why summary judgment is granted on them, too.

The Court begins with Count II, a claim of supervisor liability under Section 1983 against Sergeant Starsick of the West Virginia State Police. (ECF No. 1 at 9-10.) This count must be dismissed for the simple reason that "[i]n the absence of any underlying use of excessive force . . . liability cannot be placed on . . . a supervisor." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996). Because there is no excessive force in this case, there can be no supervisor liability, and summary judgment is appropriate.

Next, Counts IV, V, and VI allege West Virginia state constitutional violations, battery, and negligence against Trooper Stepp, Trooper Hartley, and Deputy Hickman. (*See* ECF No. 1.) State precedent makes it clear that these counts meet the same end as the Section 1983 claim. First, the West Virginia Supreme Court of Appeals has noted that the relevant portion of the West Virginia constitution "is very similar to the Fourth Amendment" and is "traditionally construed . . . in harmony with" the federal constitution. *State v. Duvernoy*, 156 W. Va. 578, 582 (1973) (citation omitted). That court has gone so far as to say that "the protections afforded West Virginia Citizens under the search and seizure provisions of our State Constitution are co-extensive with those provided for in the Fourth and Fourteenth Amendments to the United States

17

Constitution." *State v. Clark*, 232 W. Va. 480, 493 (2013). Likewise, the state law claims meet similar resistance as West Virginia law closely mirrors federal qualified immunity, saying that anyone "who is acting within the scope of his authority . . . is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established law." Syl. Pt. 5, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492 (2014) (citation omitted). Therefore, summary judgment must be granted on these counts because the officers' actions were reasonable, and no constitutional violation occurred—whether under state or federal law.

## IV. CONCLUSION

For the foregoing reasons, Defendant Hickman's Motion for Summary Judgment, (ECF No. 78), and Defendants Stepp, Hartley, and Starsick's Motion for Summary Judgment, (ECF No. 80) are **GRANTED**. Counts I, II, IV, V, and VI of the complaint, (ECF No. 1), are **DISMISSED**, with prejudice.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: February 2, 2023

THOMAS E. JOHNSTON, CHIEF JUDGE